The opinion of the court was delivered by
Breaux, J.
This was an action against the defendant for not carrying safely and delivering two out of a shipment of fourteen horses of great value shipped from New Jersey, in a special car to New Orleans. One of the horses died the day after the arrival of the train, and the other, it is alleged, was greatly injured, owing, it is charged, to the negligence of the carrier.
They were running horses, worth, it was asserted, a large sum.
The defendants deny the negligence and injury charged.
They were'^shipped at Jersey City by Adams Express. At Chattanooga they were transferred to the Southern Express Company to complete the transportation. The car in which the horses were shipped formed part of a train of the Louisville & Nashville Railroad. It was shown in evidence that in the Northern States of this country there are express trains. There are no such trains in the South; the express car always is attached to form part of a railroad train. The price of transportation paid to the express was five hundred dollars. In the special contract signed by the shipper there were a number of clauses intended by the express company to limit its liability, such as that the liability of the company was. to be that of a forwarder and not of a common carrier, and other clauses to the same effect. The contract also contained a clause with the view of binding the shipper, “ at his own risk and expense, to take care of and water the animals while being transported, whether-delayed in transit or not,” and another clause specially referring .t *1581 o ‘ detention ” during transportation. There were twelve attendants, in the service of the plaintiff, whose duty it was to take care of these horses on the cars. They had needful food and water on board. At Jersey Oity, the place of departure, all was satisfactory when the car left. No trouble of any kind had occurred on the way until a short distance north of Decatur — the more valuable of the two horses, “ Sir Francis,” became fretful and frightened; later another of the other horses commenced to kick and plunge.
Between Decatur and Birmingham they were, the witnesses testified, made desperate and crazy by the motion and noise of the running car. They kicked out of their stalls, and it required all the efforts of the attendants to keep them quiet. Having fallen down, or rather having been thrown down by the jolting car, twice, one of the plaintiffs, who was' on the train, pulled the bell cord and stopped the train. The unmanageable horses and the consequent danger were the causes for pulling the bell cord.
At Birmingham Regan, one of the owners, stepped from the car to the platform, met the express agent at that place and said to him that he had two horses that he desired to unload, The answer of the agent was, according to Regan’s account, that he could not have,them unloaded unless they were made to jump out of the car, as there was no chute to unload horses at that place. The witness said his reply to this agent was that for them to jump out in their wounded condition was an impossibility.
The express agent, on the other hand, as a witness, contradicted this plaintiff and said that he told him that he saw no way to unload-them unless they were taken to the stock yard. To do this it would have been necessary to “ cut out” this car on which the horses were from the train and to take it to the stock yard, at some distance from the station, and there unload, as there was a chute at that place. It was a matter of impossibility to unload the horses and go on with the same train. The next passenger train was due in twelve hours, and that would have been the delay, if the offer he says he made had been accepted. The conversation about unloading the horses was held, the express agent testified, in presence of other witnesses,' also servants of one of the defendant companies. They corroborated the testimony of the express agent.
While the train was at Birmingham the assistant superintendent of -the railroad at that place inquired about pulling the bell-cord and *1582 stopping the train. In reply to the inquiry the plaintiff said that he felt compelled to stop the train for the reason that the horses were no longer manageable and his attendants were in consequence in danger.
There were remonstrances made by the officer to the owner of the horses about the bell-cord pulling, which has no bearing upon the issues of the case.
He testifies that he said to this owner that in preference to delaying the train he would have the car put on the side track, to be picked up the next morning by the next passenger train. The fol-v lowing is from his testimony: “ Then I remained outside on the tender of the car and remarked to him, ‘ Well, if you think that you can get through to Montgomery wichout any trouble, all right; but if not, T will put you out at Birmingham, to be taken up by the next train.’ Then he said he thought the horse would go through all' right to Montgomery, and it was his intention to. take the horse out at Montgomery.”
The evidence does not show that anything was said about unloading horses at Montgomery after the arrival of the train at that place.
The owner, Regan, as a witness contradicted this superintended and said that such was not what he had said. The testimony of the other witnesses for plaintiffs, their attendants, on the cars as to what took place at Birmingham is not entirely clear and satisfactory upon this point. They evidently had heard that it was the owner’s desire to unload the two horses; whether the talk about the unloading was had with the superintendent or the express agent, or whether they had heard all that was said was not clearly shown.
The owner and the attendants traced, as they thought, the cause of death of one of the horses and the injury to the other to the fact chat they were not unloaded at Birmingham. The remedy was, they said, when highly bred horses, such as these were, became car frightened to unload them.
Dr. Heitzman, a veterinary surgeon called upon by plaintiffs, examined Sir Eraneis two or three hours after the arrival of plantiffs’ horses. He testified that he had intense fever and hemorrhages from the nostrils and was in a dying condition. Questioned as to the cause of the illness, he said that such illness could be occasioned by sudden changes of temperature, by exposure, ill treatment and a variety of other causes, and that he did not know what was the cause *1583 of the fever in this case, but that he died of catarrhal fever which he had had more than forty-eight hours prior to the time of the examination — a time preceding the car-freight craze near Birmingham. He suggested to the owner to have a post-mortem examination made to see if there were any 'internal bruises; none was made; the owner said to him that the dead animal had been taken off.
The verdict of the jury was for the defendant. From the verdict ' and the judgment of the court the plaintiff appeals.
THE RESPONSIBILITY WAS THAT OE THE CARRIER.
Preliminarily, we will state that carriers can not escape the duty they owe as common carriers by assuming the title of “ forwarders,” as was attempted by inserting that word in the bill of lading to which we have before referred.
The express company, in this case, being a common carrier we have treated the issues as issues between the carrier and the shipper. In the oral argument and in the reference to authorities in plaintiffs’ brief the correct principle of law was brought to our attention: that railroad companies are guilty of negligence per se for not unloading animals for rest, water and food, as required by the law.
We have no desire to limit the effect of the law or to be at all close in its interpretation, for all recognize that it was adopted for the purpose of humanizing the treatment of dumb animals and to minimize their suffering while being transported.
But it remains that while under the statute the^e is a general command to unload them every twenty-eight consecutive hours, it contains an exception that the statute shall not apply when animals are carried in cars in which they have food, water and space to rest.. U. S. R. S., Sec. 4388.
The evidence shows that the special car of the Adams Express Company in which these horses were lodged in transitu supplied these requirements.
OFFER TO SIDE-TRACK THE CAR.
A supply of food and water, however, will not operate as immunity to the common carrier, in failing to unload animals which should be unloaded for illness or other sufficient cause. The principal and important question for our determination is whether there was negli- *1584 genee on the part of the defendants in not having offered facilities to the plaintiffs to enable them to take out their horses when the car arrived at Birmingham,- and as a corollary to the foregoing the question arises, whether the defendants did all they could to comply with their obligation as common carriers.
It is abundantly established by uncontradicted testimony that there were no chutes at that station to unload live stock from the passenger train. ■ It was, therefore, impossible to lead out the two horses from the car while the train was at the passenger depot. To remove at all while at.Birmingham it would have been necessary to “ cut the car out” and pull it to the stock yard, unload there and bring the car with the remaining horses on board to the passenger train. The consequent delay would have disarranged the time schedule, and was not to be thought of. The evidence leaves only one inference, which was, that the plaintiffs, without regard to impossible conditions, expected the unloading of the two unmanageable horses and to continue on their way with the remaining horses to the point of destination.
• This was not possible, and the impossibility did not give good ground for damages, provided the defendants were not in other respects negligent.
The weight of the evidence • shows that there was willingness shown to take the plaintiffs’ car up to the stock yard and have it unloaded there. This would have necessitated a delay of twelve hours, which plaintiffs (with their remaining twelve horses) were, we believe, anxious to avoid. If the unloading, as contended for by the plaintiffs was necessary, the delay was unavoidable and should, under the circumstances, we think, have been incurred. Even an express car may be subjected to a delay without giving cause for damages. It was a misfortune to which plaintiffs were not strangers. They knew, or must be held to have known, that facilities for unloading live stock were not offered at all the stations on the route of the railroad on which they were carried.
At Montgomery, the next station, mentioned as being on the route, where there were chutes for landing live stock from an express car, nothing was said about unloading the two horses. The train stopped át this station one hour and twenty minutes. There was, it appears, ample time to safely unload the horses. Leaving this point, we Will state that, after considering the evidence, showing its im *1585 practicability, we do not think that it was neglect on the part of the defendant company not to have provided chutes to unload live stock at a passenger depot, however much it is desirable to offer facili-ies for unloading whenever it becomes necessary.
In the elaborate brief of counsel it was stated that the owner could properly decline to be left at a stock yard until the next day, to be taken up by some uncertain train, freight or passenger, endanger the lives of all his horses, because the express company had neglected to provide the necessary chute to unload two horses.
We have found no evidence of record that there was uncertainty about the arrival of the next passenger train, nor was it shown that unloading at the chute would have endangered the lives of the horses. There was no necessity to lead them into the cattle pen, after taking them through the chute at the cattle yard. “ lb has been held that where stock are suffering, or become frightened or unruly, it is the duty of the company, when properly requested, to side-track the car, when it can reasonably do so.” Elliott on Railroads, Sec. 1548.
One of the owners accompanied the horses in the transportation, and his attendants under the contract of shipment were given passage to attend the stock. There was a divided responsibility between owner and carrier. It was incumbent upon the owner to submit to some delay, particularly as his contract for transportation contained a limited liability clause regarding delay, which has been decreed binding in several well-considered decisions, “ a contract to the extent that there may be delay on the way is lawful. Squire vs. New York Central, 98 Massachusetts, pp. 239, 249. “The carrier is responsible for unreasonable delay.” Elliott on Railroads, Sec. 1482. We do not think that the offer to side-track the car, involving as it did a delay of twelve hours, was an unreasonable delay in view of the facts of the case.
RELATIVE TO THE CAUSE OE INJURY AND DEATH.
By this conclusion we were brought to the consideration of the second question at issue: the cause of injury to one of the horses and the death of the other.
With reference to the injury of the horse for which damage is claimed; while the witnesses called by the plaintiffs who testified upon the subject, and the plaintiffs themselves are doubtless sincere *1586 in believing that there was injury inflicted upon him as alleged, it remains as a fact that his speed after was greater than it had been prior to the alleged injury.
There was no testimony of any particular injury to this horse. The date of the alleged injury was late in October, in December following he was the second horse in a race in which there were seven horses. It appears that in other races prior to October his running was not among the first. Moreover, one of the veterinary surgeons who testified, said that he was called upon to examine this horse Robbie W. in December and that after the examination he made a certificate showing that he was in perfect condition.
With reference to the dead horse “ Sir Francis ” the proof does not sustain the conclusion that the injuries charged to have been suffered were the cause of his death. There is no evidence before us of internal or any other injury. The wounds are not described or referred to. The witnesses for the plaintiffs said in a broad way that he was greatly injured and died from the effect of the injuries. On the other hand, the testimony of the veterinary surgeon by whom the animal was examined raises at least grave doubts as to the correctness of the opinion of witnesses who were not experts.
THE CHARGE OP THE COURT AND THE VERDICT.
Passing to the last point in the case; counsel for plaintiffs excepted to the entire charge of the court to the jury.
We grant that the charge was erroneous. The whole testimony was admitted; the whole case is before us.
In England we are informed by the books that it is no ground for a new trial that the judge misdirected the jury, unless it is shown that the jury was thereby induced to form a wrong conclusion.
Here the verdict was right; another charge than that given would not, in our opinion, have given here reasons for a different return by the jury.
In the following cited cases the rule of law was sustained: the verdict of a jury properly grounded upon sufficient evidence will be affirmed on appeal. Howell vs. St. Charles Street R. R. Co., 22 An. 603; Moller vs. Gauche, 16 An. 44; Ayland vs. Rice, 23 An. 75.
In Brothers vs. Blair & Co., 21 An. 330, the court said: It would be fruitless to discuss the ingenious objection of the defendants to the charge of the court when the case is plainly with the plaintiffs in *1587 the evidence and the verdict is fully justified thereby, citing Maurin vs. Toustin, 6 Martin, 498.
It is therefore ordered, adjudged and decreed that the judgment appealed from is affirmed at appellant’s costs.